# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **BOBBY W. SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:05-0390** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's "Motion for Judgment on Pleadings or Administrative Record." Docket Entry No.13. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 18.

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for Judgment on Pleadings or Administrative Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

# I. INTRODUCTION

Plaintiff filed his applications for DIB and SSI on June 19, 2002, alleging that he had been disabled since October 30, 2001, due to "pinched nerve, right arm numb, 3 bulging discs in neck, arthritis." Docket Entry No. 11, Attachment ("TR"), TR 61-63, 75, 210-212. Plaintiff's applications were denied both initially (TR 37-38, 213-214) and upon reconsideration (TR 39-40, 219-220). Plaintiff subsequently requested (TR 51-52) and received (TR 53-58, 224-247) a hearing. Plaintiff's hearing was conducted on April 7, 2004, by Administrative Law Judge ("ALJ") D. Lyndell Pickett. TR 224. Plaintiff and vocational expert ("VE"), David Mark Boatner, appeared and testified. TR 226-247.

On August 27, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 14-24. Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits, as set forth in §216(i) of the Social Security Act, and is insured for benefits through March 31, 2007.
>
> 2. The claimant has not engaged in substantial gainful activity since October 30, 2001, the alleged onset date.
>
> 3. The claimant's degenerative disc disease and osteoarthritis of the cervical spine, with resultant chronic neck and arm pain are impairments considered "severe," based on the criteria in the Regulations at 20 CFR §§ 404.1520(b) and 416.920(b).
>
> 4. The claimant's severe impairments do not meet or medically equal the criteria of any listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5. The claimant's testimony was not fully credible and did not support a finding of disability.

2

6. All the medical opinions regarding the severity of the claimant's impairments have been carefully considered (20 CFR §§ 404.1527 and 416.927).

7. The claimant has the residual functional capacity to lift and/or carry up to ten pounds on a frequent basis and up to 20 pounds on an occasional basis; to stand and/or walk for a total of up to six hours per eight-hour workday; and to sit (with normal breaks) for a total of up to six hours per eight-hour work day; in addition, he is to avoid more than occasional balancing, climbing, crawling, crouching, kneeling, stooping or overhead work; he is to avoid all climbing of ropes, ladders or scaffolds; and he is to avoid more than frequent reaching or handling with the dominant right hand.

8. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9. The claimant is "a younger individual" (20 CFR §§ 404.1563 and 416.963).

10. The claimant has a "limited" education (20 CFR §§ 404.1564 and 416.964).

11. The claimant has no transferable skills (20 CFR §§ 404.1568 and 416.968).

12. Using Medical-Vocational Rule 202.18 as a framework for decisionmaking [*sic*], there are a significant number of jobs in the national economy that the claimant could perform.

13. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 22-23.

On October 27, 2004, Plaintiff timely filed a request for review of the hearing decision.

TR 12-13. On December 16, 2004, the Appeals Council issued a letter declining to review the

case (TR 9-11), thereby rendering the decision of the ALJ the final decision of the

Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42

U.S.C. §§ 405(g) and 1383(c)(3).  If the Commissioner's findings are supported by substantial

evidence, based upon the record as a whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to "pinched nerve, right arm numb, 3 bulging discs in

neck, arthritis."  TR 75.

On January 31, 1992, Plaintiff was examined at Clarksville Orthopedic Associates for an

injured thumb by Steven G. McLaughlin, M.D.  TR 146.  Dr. McLaughlin found "a markedly

tender and swollen" thumb.  *Id.*  Dr. McLaughlin diagnosed the injury as an, "ulnar collateral

strain, probable Grade II," and placed the thumb in a cast for 3 weeks.  *Id.*

On February 21, 1992, Plaintiff returned to Clarksville Orthopedic Associated for a

follow-up examination regarding his thumb cast, and was seen by Dr. McLaughlin.  TR 146.  Dr.

McLaughlin found the thumb improved, placed the thumb in a splint, and opined that Plaintiff

should remain on light duty for another 3 weeks.  *Id.*

On March 11, 1992, Plaintiff again was examined by Dr. McLaughlin at Clarksville

Orthopedic Associates.  TR 146.  Dr. McLaughlin found that Plaintiff's thumb had healed

enough for Plaintiff to return to work with no "permanent partial disability."  *Id.*

On April 1, 1992, Plaintiff returned to Clarksville Orthopedic Associates complaining of

fatigue and hand pain.  TR 146.  Dr. McLaughlin ordered x-rays on Plaintiff's hand and found

the x-rays looked "okay."  *Id.*  Dr. McLaughlin sent Plaintiff to physical therapy and ordered him

to perform light duty at work.  *Id.*

On April 15, 1992, Plaintiff was examined by Dr. McLaughlin for a follow-up regarding

4

his thumb injury.  TR 146.  Dr. Mclaughlin found that Plaintiff was "doing better," and sent him

for an evaluation to determine if Plaintiff could return to work.  *Id.*

On April 29, 1992, Plaintiff returned to Dr. McLaughlin for another follow-up

examination regarding his hand injury.  TR 146.  Dr. McLaughlin found that Plaintiff was much

improved and released him to return to work.  *Id.*

On May 11, 1993, Plaintiff underwent surgery at Clarksville Orthopedic Associates to

repair a knife laceration to his left forearm.  TR 145.  Douglas D. Porter, M.D., removed the

drain, cultured the wound, and placed Plaintiff on Cipro 500mg b.i.d. for 7 days.  *Id.*

On May 21, 1993, Plaintiff returned to Dr. Porter's office for a follow-up examination.

TR 145.  Dr. Porter removed the sutures and told Plaintiff that he could return to work on May

24.  *Id.*

On February 16, 1994, Plaintiff visited Michael D. Hooker, M.D., at Clarksville

Orthopedic Associates for complaints of hand pain.  TR 145.  Dr. Hooker noted that Plaintiff had

visited the emergency room 3 days prior for treatment of a hand injury that he sustained in a

"scuffle."  *Id.*  Plaintiff underwent x-rays which revealed a "ring metacarpal head and neck

fracture with minimal angulation or shortening."  *Id.*  Dr. Hooker placed Plaintiff's injured hand

in a splint and provided him with a "work statement for left handed activities only."  *Id.*

On February 28, 1994, Plaintiff returned to Dr. Hooker for a follow-up examination of

his hand injury.  TR 144.  Plaintiff underwent x-rays which revealed the alignment of his hand

was "maintained."  *Id.*  Dr. Hooker ordered Plaintiff to use his splint for another 2 weeks, and

then return for a re-check.  *Id.*

On March 14, 1994, Plaintiff again returned to Dr. Hooker for a follow-up examination.

5

TR 144.  Dr. Hooker conducted a physical examination which revealed some stiffness in Plaintiff's hand.  *Id*.  Plaintiff underwent x-rays which showed his hand to be in "acceptable alignment."  *Id*.  Dr. Hooker referred Plaintiff to physical therapy.  *Id*.

On April 4, 1994, Plaintiff visited Dr. Hooker for a follow-up examination regarding his hand.  TR 143.  Plaintiff's physical examination demonstrated that he could make a full fist and that his grip strength was "approaching normal."  *Id*.  Dr. Hooker recommended that Plaintiff return to full activities at work.  *Id*.

On April 21, 1994, Plaintiff returned to Dr. Hooker complaining of hand pain.  TR 143.  Dr. Hooker took x-rays of Plaintiff's hand which revealed, "no new or change in alignment of his previous ring MC neck fracture."  *Id*.  Dr. Hooker opined that Plaintiff had contused the hand and recommended that Plaintiff could return to work activities.  *Id*.

On February 15, 1999, Plaintiff was examined by W. Cooper Beazley, M.D., at Premier Medical Group in Clarksville, Tennessee, for complaints of knee pain.  TR 142.  Dr. Beazley conducted a physical examination of Plaintiff and found Plaintiff's knee "sore and tender."  *Id.*  Plaintiff underwent x-rays of his knee, the results of which were "normal."  *Id.*  Dr. Beazley's impression was, "knee pain, etiology unclear, very likely it could be something like gout."  *Id*.  Dr. Beazley prescribed Naprosyn 500 mg b.i.d., and recommended that Plaintiff return in a week.  *Id.*

On February 22, 1999, Plaintiff returned to Dr. Beazley for a follow-up examination regarding his complaints of knee pain.  TR 142.  Dr. Beazley concluded that the Naprosyn was "resolving gouty arthritis" and that Plaintiff should finish his current prescription and start taking Naprosyn again if the pain returned.  *Id.*

6

On February 5, 2000, Plaintiff was examined by Robert D. Doty, Jr., M.D., at the Gateway Medical Center Emergency Room for injuries sustained as a result of being struck in the nose and face. TR 189-92. Dr. Doty ordered x-rays of Plaintiff's face which revealed a "nasal bone fracture." TR 192. Dr. Doty bandaged the wound and instructed Plaintiff to take Aspirin, Tylenol, Ibuprofen, or Aleve for the pain, to use ice, and to elevate the injury. TR 191.

On September 19, 2000, on behalf of Dr. Beazley, Plaintiff was examined by Kitty Stephens, N.P., for complaints of neck and left shoulder pain. TR 141. Upon physical examination, Nurse Stephens found that Plaintiff was "sore and tender in the levator scapular region." *Id.* The results of Plaintiff's sensory and motor examinations were "normal." *Id.* Plaintiff underwent x-rays which revealed "some arthritic change in the mid and lower cervical region as well as a loss of the lordotic curve of the neck." *Id.* Nurse Stephens injected 80 mg Depo-Medrol, 4 mg dexamethasone, 3.5 Xylocaine, and 3.5 cc Marcaine into Plaintiff's shoulder. *Id.* Nurse Stephens also provided Plaintiff with Co-Gesic #20. *Id.*

On October 23, 2000, Plaintiff was examined by Dr. Beazley for complaints of left cervical radiculopathy and left rotator cuff tendonitis. TR 140. Dr. Beazley conducted a physical examination which revealed neck tenderness, and he diagnosed cervical radiculopathy. *Id.* Dr. Beazley ordered a cervical MRI and prescribed Co-Gesic #30. *Id.*

On October 27, 2000, Fred Isaacson, M.D., of Premier Imaging Center, conducted an MRI of Plaintiff's cervical spine. TR 134-36. Plaintiff's MRI revealed "left-sided herniations of C4-C5 and C5-C6 with left-sided neural impingement," and "multi-level degenerative disc disease." TR 136.

On November 13, 2000, Plaintiff returned to Nurse Stephens to discuss the results of his

October 27 MRI. TR 139. Plaintiff complained of shoulder pain that radiated down his upper arm. *Id.* Nurse Stephens concluded that there was "probable HNP at the C4-5 level with left radiculopathy," and she prescribed an epidural injection. *Id.*

On June 11, 2001, Plaintiff returned to Dr. Beazley for a follow-up examination regarding a "cervical disc herniation on the left." TR 139. Dr. Beazley recorded that Plaintiff expressed concern about his ability to work, but noted that Plaintiff "has done pretty well," that the tingling and numbness in his left arm had resolved, that Plaintiff's neck pain had "markedly decreased," and that Plaintiff was "having very little trouble." *Id.* Dr. Beazley concluded that Plaintiff could work unrestricted. *Id.*

On December 14, 2001, Plaintiff visited the Gateway Medical Center Emergency Room for an open wound on his left hand. TR 178-88. Plaintiff was examined by Mackdell R. Long, M.D., who noted that Plaintiff had not lost range of motion in his fingers. TR 181-82. Plaintiff's wound was closed and bandaged, and Plaintiff was told to return in 2 days to have the dressing changed. TR 182.

On December 18, 2001, Plaintiff returned to the Gateway Medical Center Emergency Room for a follow-up examination regarding his left hand wound. TR 175-77. Plaintiff's wound was cleaned and re-bandaged, and Plaintiff's hand was placed in a splint. TR 176.

On May 7, 2002, Plaintiff visited the Gateway Medical Center Emergency Room complaining of neck and back pain. TR 121-122. Plaintiff reported that he had returned to work the previous week, that this had exacerbated his pain, and that the pain radiated down his shoulder. TR 122. Plaintiff was diagnosed with "acute exacerbation neck pain." *Id.*

On August 1, 2002, Plaintiff was examined by Donita Keown, M.D., on behalf of the

8

Tennessee Disability Determination Services.  TR 129-31.  Dr. Keown noted that while conducting a motor strength examination of Plaintiff's right upper extremity, Plaintiff "approached with very poor effort," and she opined, "It is clear that he is attempting to mislead this examiner."  TR 131.  Dr. Keown observed that there was no "evidence to suggest disability because of neck pain."  *Id.*  Dr. Keown opined that Plaintiff could "sit, stand or walk 6 hours in an 8 hour day, routinely lift 15 to 20 pounds, [and] episodically lift 35 to 40 pounds."  *Id.*

On September 9, 2002, on behalf of the Tennessee Department of Human Services, Plaintiff was examined by George W. Bounds, M.D.  TR 132.  Dr. Bounds completed an "Analysis by DDS Medical Consultant" form concerning Plaintiff.  *Id.*  Dr. Bounds indicated that Plaintiff had "Physical impairment(s) not severe, singly or combined," and he noted that Plaintiff's "description of pain is not credible given his poor effort on exam and lack of findings."  *Id.*  Dr. Bounds also noted that, "CEMA limits lifting to 40/20 lbs but there is no justification for such a restriction."  *Id.*

On September 18, 2002, Plaintiff was examined by Dr. Beazley for complaints of right cervical radiculopathy.  TR 138.  Dr. Beazley conducted a physical examination that revealed a sore neck and cervical radiculopathy "on the right this time, not the left."  *Id.*  Dr. Beazley ordered another MRI scan for comparison and refilled Plaintiff's Flexeril #30 and Ultracet #30. *Id.*

On September 25, 2002, Plaintiff underwent an MRI of his cervical spine.  TR 133. When comparing the results of this MRI to Plaintiff's MRI of October 27, 2000, the radiologist noted that there was no appreciable change.  *Id.*  The radiologist observed: "There are again noted left sided herniations of the C4-5 and the C5-6 discs.  There are degenerative changes of

9

both discs that are unchanged. Degenerative disc disease is again noted at C6-7 and C7-T1." *Id*

On October, 9, 2002, Plaintiff returned to Dr. Beazley's office to discuss the results of his September 25 MRI and for a follow-up examination regarding his cervical arthritis with radiculopathy. TR 138. Nurse Stephens noted that Plaintiff's MRI revealed "degenerative disc disease with changes occurring at the C4, C5 and C6 regions." *Id.* Nurse Stephens prescribed Co-Gesic #30 and recommended that Plaintiff remain off work until his next appointment. *Id.*

On November 13, 2002, Plaintiff returned to Dr. Beazley for a follow-up examination regarding his "cervical radiculopathy on the left worse than right." TR 137. Dr. Beazley observed that Plaintiff was in "significant discomfort with his neck and pain going down the left shoulder and trapezius region." *Id.* Dr. Beazley's impression was "Persistent cervical radiculopathy." *Id.* He continued Plaintiff's prescriptions of Co-Gesic #30 and Flexeril #30, and placed Plaintiff in physical therapy. *Id.*

On December 4, 2002, Robin Richard, M.D., completed an Physical Residual Functional Capacity Assessment form concerning Plaintiff. TR 147-154. Dr. Richard indicated that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8 hour workday, and push and/or pull without limitation. TR 148. Dr. Richard further indicated that Plaintiff could frequently engage in climbing, balancing, stooping, kneeling, crouching, and crawling[1] (TR 149), and that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations (TR 150-151). Dr. Richard observed that

_____

[1]Dr. Richard also indicated that Plaintiff could occasionally engage in climbing and crawling. TR 149.

10

Plaintiff had exhibited "poor effort" (TR 148) and concluded that Plaintiff suffered from a "temporary restriction only" (TR 153).

On January 8, 2003, Plaintiff returned to Nurse Stephens for a follow-up regarding his right cervical radiculopathy. TR 203. Nurse Stephens conducted a physical examination of Plaintiff that revealed a stiff range of motion in the neck and soreness in the medial scapular regions bilaterally. *Id*. The examination also revealed full range of motion in the shoulders, some numbness in the right ring and little fingers, no swelling distally about the hand or wrist, and intact pulses in both extremities. *Id*. Nurse Stephens conducted Tinel tests on the elbow and wrist, both of which were negative. *Id*. Nurse Stephens gave Plaintiff samples of Mobic 7.5 mg and renewed Plaintiff's prescription for Flexeril #30 and Lortab 7.5 #30. *Id*.

On February 19, 2003, Plaintiff was examined by Dr. Beazley for complaints of right cervical radiculopathy. TR 202. Dr. Beazley conducted a physical examination of Plaintiff which was "amazingly normal." *Id*. Dr. Beazley gave Plaintiff Neurontin 100 mg p.o. t.i.d. for one week and 300 mg t.i.d. for 3 to 4 weeks. *Id*.

On March 19, 2003, Plaintiff visited the Gateway Medical Center Emergency Room complaining of upper back pain on the right side, and was treated by Stephen W. Kent, M.D. TR 170-174. Dr. Kent conducted a physical examination of Plaintiff which revealed "tenderness over the right posterolateral neck with a positive Spurling on the right with pain reproduced with extension of the neck but was able to flex and rotate adequately." TR 173. Dr. Kent diagnosed "right cervical radiculopathy with acute exacerbation," and prescribed Demerol, Phenergan, and Decadron. TR 173-174.

Later on March 19, 2003, Plaintiff visited Nurse Stephens for a follow-up examination

11

regarding his visit to the Emergency Room earlier in the day. TR 201. Nurse Stephens conducted a physical examination on Plaintiff and noted that Plaintiff, "appears to be in mild distress, although his exam today appears to be virtually normal in regard to both his sensory and his motor exam, as well as any soreness to palpation." *Id*.

On April 9, 2003, Plaintiff returned to Nurse Stephens for a follow-up examination. TR 200. Nurse Stephens observed that Plaintiff had a mildly sore right posterior shoulder blade and numbness in the right little and ring finger, and noted that Plaintiff's range of motion was "much improved." *Id*. Nurse Stephens gave Plaintiff some Bextra samples, and instructed him to return as needed. *Id*.

On May 18, 2003, Plaintiff visited the Gateway Medical Center Emergency Room complaining of chronic neck pain, headache, and a throbbing pain around the right eye. TR 166-169. Plaintiff was observed by William D. Shippen, M.D., who ordered a CT scan of Plaintiff's head and x-rays of Plaintiff's sinuses, the results of which were both "negative." TR 168-169. Dr. Shippen diagnosed "cocaine abuse," ordered Plaintiff to "stop abusing drugs," and gave Plaintiff medication for his headache.[2] TR 167.

On May 21, 2003, Plaintiff returned to the Gateway Medical Center Emergency Room complaining of neck pain and arthritis. TR 162-163. Plaintiff admitted occasional cocaine usage. TR 163. The physician[3] diagnosed Plaintiff with a headache, ordered an CT scan of Plaintiff's head, and recommended an MRI. *Id.*

On June 20, 2003, Plaintiff visited Nurse Stephens for a follow-up examination regarding

---

[2]The prescription is illegible. TR 167.

[3]The signature on the chart is illegible. TR 163

12

his cervical radiculopathy. TR 199. Nurse Stephens conducted a physical examination which revealed that Plaintiff was sore in the right medial scapular region, had increased pain with range of motion especially in the neck, had decreased grip strength in the right hand, and had numbness in the right ring and little fingers. *Id*. Nurse Stephens did not prescribe any medication and opined, "I am not sure there is much left to offer this gentleman." *Id*.

On July 21, 2003, Plaintiff returned to Nurse Stephens for a follow-up examination regarding his right cervical radiculopathy. TR 198. Nurse Stephens conducted a physical examination of Plaintiff which revealed full range of motion in the neck and upper extremities. *Id*. Nurse Stephens noted a "significant trigger point at the base of the neck and in the levator scapular region." *Id*. Nurse Stephens gave Plaintiff Co-Gesic #20. *Id*.

On August 25, 2003, Plaintiff again returned to Nurse Stephens for a follow-up examination regarding his right cervical radiculopathy. TR 197. Nurse Stephens found soreness at the base of the neck and some medial scapular tenderness on the right. *Id*. She diagnosed "cervical radiculopathy that persists," and gave Plaintiff a Medrol Dosepak and Mobic 15 mg. *Id*.

On August 27, 2003, Plaintiff visited the Gateway Medical Center Emergency Room complaining of neck and back pain. TR 158-161. The emergency room physician diagnosed Plaintiff with acute vertigo.[4] TR 159. The physician also ordered a chest x-ray, which revealed "no acute pulmonary abnormality." TR 161.

On October 13, 2003, Plaintiff visited Nurse Stephens for a follow-up examination

---

[4]The emergency room physician, whose signature is illegible, made an additional diagnosis, but it is illegible. TR 158-159.

13

regarding his complaints of cervical arthritis. TR 196. Nurse Stephens noted that Plaintiff was presenting with left shoulder pain, whereas it was previously only in the right. *Id*. Nurse Stephens conducted a physical examination from which she diagnosed cervical arthritis with left trigger point. *Id*. Nurse Stephens injected the trigger point area with 80 mg of Depo-Medrol. 4 mg of dexamethasone, 3 ½ cc of Xylocaine and 3 ½ cc of Marcaine, and she provided Plaintiff with Co-Gesic #20. *Id*.

On October 22, 2003, Dr. Beazley completed a Medical Assessment of Ability to do Work-Related Activities form concerning Plaintiff. TR 156-157. Dr. Beazley indicated that Plaintiff could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk for a total of less than 2 hours in an 8 hours workday, and sit (with normal breaks) for a total of less than 4 hours in an 8 hour workday. *Id*.

On December 8, 2003, Plaintiff returned to Nurse Stephens for a follow-up examination regarding his "C4 and C5 disc herniation to the left." TR 195. Nurse Stephens conducted a physical examination of Plaintiff which revealed soreness at the base of the neck and into the left medial scapular region. *Id*. The examination also revealed, "increased left arm pain with extension of the neck while sensory and motor examination appears to be grossly intact with the exception of some numbness in the left arm." *Id*. Nurse Stephens determined that Plaintiff had "C4 and C5 disc herniation that remained symptomatic." *Id*. She renewed Plaintiff's prescription for Co-Gesic #30 and gave him some Mobic 15mg samples. *Id*.

On December 12, 2003, Philip Montague, P.T., completed a Physical Therapy & Sports Medicine Cervical Spine Evaluation/Plan of Care form concerning Plaintiff. TR 207-208. Mr. Montague noted that Plaintiff had "pain with all range of motion especially side bending out

14

rotation on the right upper trap region."  TR 207.  Mr. Montague also found "reduced cervical spine range of motion, reduced grip and strength in right upper extremity."  *Id*.  Mr. Montague suggested that Plaintiff try a TENS unit and traction to reduce pain.  *Id*.

On January 20, 2004, Plaintiff returned to Nurse Stephens for a follow-up examination regarding his "HNP at the C5 level and C6 level."  TR 194.  Upon physical examination, Nurse Stephens found that Plaintiff was sore around the base of the neck and bilateral medial scapula. *Id*.  Nurse Stephens also indicated that Plaintiff had pain with extension of the neck and numbness of the left hand.  *Id*.  Nurse Stephens noted that Plaintiff was running out of "inexpensive options"; she provided Plaintiff with samples of Mobic and noted that she would try and locate a TENS unit for Plaintiff to use.  *Id.*

On March 30, 2004, Plaintiff was examined by Dr. Beazley for complaints of bilateral cervical radiculopathy.  TR 193.  Dr. Beazley found tenderness in Plaintiff's C-spine.  *Id*. Additionally, Plaintiff's range of motion in C-spine was 80%, and Plaintiff had mild spasm and tingling bilaterally in his hands.  *Id*.  Dr. Beazley diagnosed "cervical radiculopathy on the right," recommended another MRI scan, and prescribed Co-Gesic #30.  *Id*.

On April 6, 2004, Plaintiff underwent an MRI of the cervical spine, the results of which were as follows:

> 1. There is evidence of degenerative disc disease with left paracentral protrusion of disc material seen at the C4/C5 level. There is left lateral protrusion of disc material seen at the C5/C6 level.
>
> 2. There is reversal of the usual lordotic curvature.  This may be positional vs representing muscle spasm.

TR 209.

## B. Plaintiff's Testimony

Plaintiff was born on October 14, 1955, and has a tenth grade education. TR 239.

Plaintiff worked at Vulcan for approximately 13 years, but was placed on medical leave and later on permanent leave without pay, because he was no longer able to do his work as a result of pain. TR 229. Plaintiff reported that he had not received checks from Vulcan since May of 2002. *Id.*

Plaintiff testified that his pain ran down his neck into his arms, that he had lost grip in both hands, that his right hand was numb "all the time," and that he had dropped glasses. TR 230. Plaintiff reported that his pain had gradually worsened and that he was in pain "most all the time every day." *Id.* Plaintiff further reported that he is right-handed and that most of the "numbness" was on his right side. *Id.*

Plaintiff stated that Dr. Beazley had suggested surgery, but had decided against it because he did not know which disc was causing the problem, and he did not want to risk paralyzing Plaintiff. TR 231. Plaintiff further stated that Dr. Beazley had referred Plaintiff to Dr. Spangler in Nashville for a second opinion. *Id.*

Plaintiff stated that he had not paid Dr. Beazley for his services, but that Tenn Care Select was going to pay for the visits from March 19, 2003, until the date of the hearing. TR 231-32.

Plaintiff stated that he took "Hydrocodene" [*sic*] and Mobic 15 milligrams, but that the medications did not "cure" his problems. TR 232. Plaintiff testified that the "Hydrocodene" caused downiness and that he had to lie down for anywhere from 4 to 6 hours after taking the medicine. TR 232-33. When asked why he could not perform a job where he could "just stand

16

and sit all day," Plaintiff answered that he would not be able to stay focused and would fall asleep on the job.  TR 236.

Plaintiff stated that he lived with his niece who helped him.  TR 233-234.  Plaintiff reported that he watched TV or read the Bible, and that he sometimes went to church on Sundays.  TR 234.  Plaintiff stated that he could sit comfortably for about 30 minutes before his back would stiffen.  TR 235.  Plaintiff testified that when he would stiffen up, he would use a TENS unit to help alleviate the pain, but he noted that it would only help for "a few minutes." *Id*.  Plaintiff noted that sometimes his niece would have to help put on the TENS unit because he was unable to raise his arms when he stiffened up.  *Id*.

Plaintiff testified that he had problems with both sides, but noted greater problems with his right side.  TR 236.  In response to the ALJ's noting that "most of these records are talking about [Plaintiff's] left side," Plaintiff stated that his doctors also wondered why the pain was on his right, but the problems were on the left.  TR 236-237.

### C.  Vocational Testimony

Vocational expert ("VE"), Mark Boatner, also testified at Plaintiff's hearing.  TR 238-247.

The VE stated that Plaintiff had worked for 13 years with a rubber goods production company as a rubber cutting machine tender and a rubber goods cutter and finisher.  TR 239.  The VE classified Plaintiff's rubber cutting machine tender job as unskilled and heavy, and his rubber goods cutter and finisher job as semi-skilled and medium.  TR 239-40.

17

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff [5] and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 240. The VE answered that the hypothetical claimant could not perform any of Plaintiff's past relevant work, but noted that there would be several other jobs available. *Id.* The VE opined that there were approximately 570 furniture rental clerk positions available in a 90 mile radius surrounding Nashville and 475,000 in the national economy, approximately 875 storage facility rental clerk positions in the region and 290,000 in the national economy, and approximately 640 merchandise marker positions in the region and 435,000 in the national economy, all of which would be appropriate for the hypothetical claimant. *Id.* In addition to the furniture rental clerk, storage facility rental clerk, and merchandise maker positions, the VE testified that there were numerous other unskilled, light job positions that would be appropriate for the hypothetical claimant. TR 241.

The ALJ then presented the VE with a modified hypothetical, adding "only frequent, not constant, handling or reaching with the left non-dominant hand, so we've got those same restrictions in both sides of the body." TR 241. The VE responded that the same jobs would be available to this hypothetical claimant as the original claimant. *Id.*

The ALJ presented the VE with a second modified hypothetical and asked what jobs would be available for that claimant. TR 242. The third hypothetical claimant had the same

---

[5]The hypothetical claimant had the same age, educational, and vocational background as Plaintiff, retained the Residual Functional Capacity to perform light work that did not require climbing of ladders, ropes, or scaffolds, and would require only occasional climbing of ramps and stairs, only occasional balancing, stooping, kneeling, crouching, and crawling, only occasionally working overhead, and only frequent handling and reaching with the right dominant hand. TR 240.

restrictions as the original hypothetical but with the modified restriction of occasional handling and reaching with the right dominant hand and frequent handling and reaching with the left hand. *Id*. The VE responded that the furniture rental clerk job would still be available for this hypothetical claimant, but that the storage rental clerk position would not. *Id*. The VE added that the job of molding machine tender would be available, and that within the 90 mile radius surrounding Nashville there were approximately 460 jobs available and 129,000 in the national economy. TR 243.

The ALJ presented the VE with a third modified hypothetical and asked the VE what jobs would be available for this claimant. TR 243. This hypothetical claimant had the same limitations as the original hypothetical claimant, but with the modified restriction of occasional handling and reaching with both the right and left hands. *Id*. The VE responded that the furniture rental clerk and molding machine tender jobs would remain available for this hypothetical claimant. *Id*.

The ALJ presented the VE with another modified hypothetical claimant, who possessed the same restrictions as the original hypothetical claimant, but with the added restriction of no use of one arm. TR 244. The VE responded that there would be no jobs available for this claimant. *Id*.

The ALJ presented the VE with a fifth modification of the original hypothetical and asked the VE what jobs were available for this claimant. The ALJ assigned this hypothetical claimant the following restrictions: could lift 10 pounds occasionally and 5 pounds frequently, could stand or walk one hour out of an 8 hour day and could only sit 3 hours out of an 8 hour day. TR 245. The VE responded that there would not be any full-time positions available to this

19

claimant. *Id*.

Plaintiff's attorney presented the VE with a hypothetical based on Plaintiff's testimony at the hearing coupled with the medical record and asked what jobs would be available. TR 245. The VE responded that there would be no jobs for a person under those circumstances. *Id*.

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270,

20

273 (6th Cir. 1997)).  If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which

21

significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[6] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with

---

[6]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that, (1) the ALJ did not give appropriate weight to the opinions of his treating physician, (2) the ALJ wrongly found that Plaintiff's testimony was not fully credible, and (3) the RFC finding erroneously did not include a restriction for Plaintiff's left hand or arm. Docket Entry No. 14.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Weight Accorded to Opinion of Plaintiff's Treating Physician

Plaintiff maintains that the ALJ did not give appropriate weight to Dr. Beazley's opinions. Docket Entry No. 14.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

24

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

The record demonstrates that Plaintiff visited Dr. Beazley's office more than 20 times between February 15, 1999, and April 6, 2004.  TR 142, 209.  Accordingly, the record establishes that Dr. Beazley treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions.  As the Regulations state, however, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2).

Dr. Beazley's October 22, 2003, Medical Assessment of Ability to do Work-Related Activities form indicated, *inter alia*, that Plaintiff could stand and/or walk for a total of less than 2 hours in an 8 hour day and sit (with normal breaks) for a total of less than 4 hours in an 8 hour workday.  TR 156-157.  That Assessment, however, is inconsistent with other substantial

25

evidence of record, including Dr. Beazley's own progress notes.  For example, a Physical

Residual Functional Capacity Assessment completed on December 4, 2002, by Dr. Richard,

indicated that Plaintiff could stand and/or walk for about 6 hours in an 8 hour day, and could sit

(with normal breaks) for about 6 hours in an 8 hour day.  TR 148.  Additionally, Dr. Keown

found that Plaintiff had a full range of motion, could sit, stand or walk 6 hours in an 8 hour day,

could routinely lift 15 to 20 pounds, and could episodically lift 35 to 40 pounds.  TR 131.

When there is contradictory evidence, the treating physician's opinion is weighed against

the contradictory evidence and the final decision regarding the weight to be given to the differing

opinions lies with the Commissioner.  *See* 20 C.F.R. § 416.927(e)(2).  Because Dr. Beazley's

Assessment is inconsistent with other evidence of record, the Regulations do not mandate that

the ALJ accord Dr. Beazley's evaluation controlling weight.  Accordingly, Plaintiff's argument

fails.

## 2.  Credibility

Plaintiff contends that the ALJ erroneously found that his subjective complaints were

not fully credible.  Docket Entry No. 14.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's

allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain,
> cannot alone support a finding of disability...[T]here must be
> evidence of an underlying medical condition *and* (1) there must
> be objective medical evidence to confirm the severity of the
> alleged pain arising from the condition *or* (2) the objectively
> determined medical condition must be of a severity which can
> reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d

Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that Plaintiff's testimony was inconsistent with the weight of the medical evidence and was not wholly credible. TR 20. Specifically, the ALJ articulated that the medical evidence of record did not support Plaintiff's allegations of inability

27

to grip or to use his hands, despite his complaints of chronic achiness in the neck and arm. *Id*. Additionally, the ALJ noted that Plaintiff's attempt to deceive Dr. Keown during strength testing further undermined his credibility. *Id*. The ALJ's decision specifically addresses not only the medical evidence, but also Plaintiff's testimony and his subjective claims, indicating that these factors were considered. TR 23. To illustrate, the ALJ recounted:

> The claimant testified at the hearing that he cannot work due to chronic pain affecting the neck, shoulders and arms. He stated that he is unable to grip effectively with either hand. He related that he takes medications for arthritis and for pain and that these cause him to be drowsy. He described daily activities that included little more than watching television and reading the Bible.

TR 20.

The ALJ's decision properly discusses Plaintiff's "activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain." *Felisky*, 35 F.3d at 1039 (*construing* 20 C.F.R. § 404.1529(c)(2)). It is clear from the ALJ's articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ observed Plaintiff during his hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

### 3. Residual Functional Capacity and Substantial Evidence

Plaintiff maintains that the ALJ's residual functional capacity finding erroneously did

not include a restriction for Plaintiff's left hand or arm.  Docket Entry No. 14.  Plaintiff's

argument on this point, in its entirety, is as follows:

> Strangely, even though the MRI's support a finding of limitations
> in the left arm/hand, the residual functional capacity mentions only
> the dominant right hand (Tr. 23).  The omission of left hand/arm
> limitations calls into question the residual functional capacity
> finding.

Docket Entry No. 14, p. 18.

The record in the case at bar  is replete with doctors' evaluations, medical assessments,

and test results, all of which were properly considered by the ALJ, and all of which constitute

substantial evidence to support the ALJ's determination that Plaintiff retained the Residual

Functional Capacity "to lift and/or carry up to ten pounds on a frequent basis and up to 20

pounds on an occasional basis; to stand and/or walk for a total of up to six hours per eight-hour

workday; and to sit (with normal breaks) for a total of up to six hours per eight-hour work day;

in addition, he is to avoid more than occasional balancing, climbing, crawling, crouching,

kneeling, stooping or overhead work; he is to avoid all climbing of ropes, ladders or scaffolds;

and he is to avoid more than frequent reaching or handling with the dominant right hand."  TR

23.  The ALJ's determination that Plaintiff retained the Residual Functional Capacity to

perform light and unskilled work was further supported by the VE's testimony.  TR 239-247.

Despite Plaintiff's argument that "The omission of left hand/arm limitations calls into

question the residual functional capacity finding," substantial evidence supports the ALJ's

determination.  Because there substantial evidence supports the ALJ's Residual Functional

Capacity determination, that determination must stand.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's "Motion for Judgment on Pleadings or Administrative Record" be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

30